USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1514 ACQUILES LEONIDAS CABRAL, Petitioner, v. IMMIGRATION AND NATURALIZATION SERVICE, Respondent. ____________________ ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS ____________________ Before Selya, Cyr and Stahl, Circuit Judges. ______________ ____________________ Randy Olen for petitioner. __________ William C. Lengacher, Attorney, Office of Immigration ______________________ Litigation, with whom Frank W. Hunger, Assistant Attorney _________________ General, and Richard M. Evans, Assistant Director, were on brief ________________ for respondent. ____________________ January 31, 1994 ____________________ CYR, Circuit Judge. After Acquiles Leonidas Cabral was CYR, Circuit Judge. _____________ convicted by the Commonwealth of Massachusetts as an accessory to murder, he was ordered deported for committing a "crime involving moral turpitude" within five years of his lawful entry into the United States. We deny his petition for review of the final order of deportation. I I BACKGROUND BACKGROUND __________ A citizen of the Dominican Republic, Cabral was allowed to enter the United States as a resident alien on July 21, 1983. On December 14, 1984, he was charged with murder after the Boston police stopped a van containing Cabral, two other men, and a corpse wrapped in a carpet. Cabral later pled guilty as an accessory after the fact to murder, see Mass. Gen. Laws ch. 274, ___ 4 (1990), and received a four-to-seven year prison term.1 During the deportation proceedings which followed, Cabral con- tended, as he does now, that the crime of accessory after the fact to murder is not a "crime involving moral turpitude" (or "CIMT") within the meaning of 8 U.S.C. 1251(a)(4).2 An Immigration Judge (IJ) found that Cabral's conviction as an accessory after the fact to the voluntary murder charged in the ____________________ 1No one has been convicted of the murder. 2This section was redesignated in 1990 as 8 U.S.C. 1251(a) (2)(A)(i) by Pub. L. No. 101-649 601(a), 104 Stat. 5066-85 (1990). 2 Massachusetts indictment established that Cabral was an accessory to a CIMT. See In re Sanchez-Marin, 11 I. & N. Dec. 264 (BIA ___ ____________________ 1965). The IJ accordingly ordered deportation under section 1251(a)(4). The Board of Immigration Appeals (BIA) affirmed the order of deportation, and Cabral petitioned for review. II II DISCUSSION DISCUSSION __________ A. Standard of Review A. Standard of Review __________________ As the petition for review presents a pure issue of statutory construction, we review de novo, according due defer- __ ____ ence to the BIA's interpretation of the deportation statute. Mosquera-Perez v. INS, 3 F.3d 553, 554 (1st Cir. 1993). See ______________ ___ ___ Jaramillo v. INS, 1 F.3d 1149, 1153 (11th Cir. 1993); see also _________ ___ ___ ____ INS v. Jong Ha Wang, 450 U.S. 139 (1981) (per curiam) (pre- ___ _____________ Chevron case overturning court of appeals' decision reversing _______ "reasonable" INS interpretation of statute). We look first to the language of the statute itself, employing traditional tools of statutory construction, see Mosquera-Perez, 3 F.3d at 554-55, ___ ______________ to see if the legislative intent is clear, Chevron U.S.A., Inc. ____________________ v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 _________________________________________ (1984). We look to the legislative history only if "the literal words of the statute create ambiguity or lead to an unreasonable interpretation." United States v. Charles George Trucking Co., ______________ ____________________________ 823 F.2d 685, 688 (1st Cir. 1987) (citation omitted). Where Congress has not spoken directly to the issue, the interpretation given by the BIA is entitled to deference unless arbitrary, 3 capricious, or manifestly contrary to the statute. See Mosquera- ___ _________ Perez, 3 F.3d at 555; see also Alvares-Flores v. INS, 909 F.2d 1, _____ ___ ____ ______________ ___ 3 (1st Cir. 1990). In all events, as the final authority in matters of statutory interpretation, the courts "'must reject administrative constructions which are contrary to clear congres- sional intent.'" Mosquera-Perez, 3 F.3d. at 555 (quoting Chev- ______________ _____ ron, 467 U.S. at 843 n.9). ___ B. The Deportation Statute B. The Deportation Statute _______________________ (i) The Statutory Language (i) The Statutory Language ______________________ Section 1251(a)(4) itself states in relevant part: (a) General classes. Any alien in the Unit- (a) General classes. ed States . . . shall, upon the order of the Attorney General, be deported who . . . . (4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more. . . . 8 U.S.C. 1251(a)(4). All preconditions for deportation under section 1251(a)(4) are plainly met in the present case, save possibly the CIMT requirement. As to whether an accessory after the fact to murder has committed a CIMT, however, the language of the statute is silent. We therefore look to its legislative history. (ii) The Legislative History (ii) The Legislative History _______________________ The available legislative history reveals that the term "moral turpitude" first appeared in the federal immigration laws in 1891. See S. Rep. No. 1515, 81st Cong., 2d Sess. 350 (1950); ___ 4 Charles Gordon, Immigration Law and Practice 71.05[1][a], 71- _____________________________ 121 (Supp. 1993). Justice Jackson offered the following insight into the legislative history of the Immigration Act of 1917, see ___ S. Rep. No. 352, 64th Cong., 1st Sess. 390 (1916), the first to authorize deportation of resident aliens convicted of a "crime involving moral turpitude": The uncertainties of this statute do not originate in contrariety of judicial opinion. Congress knowingly conceived it in confusion. During the hearings of the House Committee on Immigration, out of which eventually came the Act of 1917 in controversy, clear warning of its deficiencies was sounded and never de- nied. "Mr. SABATH. . . . [Y]ou know that a crime involving moral turpitude has not been defined. No one can really say what is meant by saying a crime involving moral turpi- tude. . . ." Despite this notice, Congress did not see fit to state what meaning it attributes to the phrase "crime involving moral turpi- tude." Jordan v. De George, 341 U.S. 223, 233-34 (1951) (Jackson, J., ______ _________ dissenting) (quoting from House Committee on Immigration and Naturalization Hearings on H.R. Rep. No. 10384, 64th Cong., 1st Sess. 8 (1916)).3 The legislative history leaves no doubt, ____________________ 3A Senate subcommittee report accompanying the Immigration Act of 1952 relating to the exclusion of aliens convicted of a CIMT notes that the term "moral turpitude" "has not been defini- tively and conclusively defined by the courts. One INS decision held that 'moral turpitude' is a vague term. . . ." S. Rep. No. 1515, 81st Cong., 2d Sess. 351 (1950). Nevertheless, the Senate subcommittee did not adopt the suggestion that "there be a listing of crimes and circumstances comprehended within the meaning of moral turpitude," id. at 353, so as to remove some of ___ the interpretive discretion left to those who must apply the term 5 therefore, that Congress left the term "crime involving moral turpitude" to future administrative and judicial interpretation. C. Reasonableness of Agency Interpretation C. Reasonableness of Agency Interpretation _______________________________________ Although voluntary murder is universally recognized as a CIMT, see, e.g., De Lucia v. Flagg, 297 F.2d 58, 61 (7th Cir. ___ ____ ________ _____ 1961), cert. denied, 369 U.S. 837 (1962), the statutory language _____ ______ and the legislative history are silent as to whether an alien convicted as an accessory after the fact to voluntary murder has committed a CIMT. We therefore inquire whether the agency interpretation was arbitrary, capricious, or clearly contrary to the statute. See Mosquera-Perez, 3 F.3d at 555. ___ ______________ We note first that the record establishes, as the IJ found, that Cabral pled guilty as an accessory to voluntary murder. The Massachusetts indictment, part of the record of conviction, see United States ex rel. Zaffarano v. Corsi, 63 F.2d ___ _______________________________ _____ 757, 759 (2d Cir. 1933) (per curiam) (on rehearing) (holding that "the record of conviction . . . mean[s] the charge (indictment), plea, verdict, and sentence"), alleged: JOHN DOE . . . on or about December 14, 1984, did assault and beat one Nathan Lee Gales, with intent to murder him and by such assault and beating did kill and murder the said Nathan Lee Gales. And that, AQUILES [sic] CABRAL, afterwards, well knowing the said John Doe to ____ _______ ___ ____ ____ ___ __ ____________________ in excluding aliens. Moreover, although the term has been part of our immigration laws for more than 100 years, Congress has chosen not to define it, either in the deportation or alien exclusion contexts. See Gordon, at 71-146 supra, 71.05[1][d]. ___ _____ 6 have committed the felony aforesaid, did ____ _________ ___ ______ _________ harbor, conceal, maintain and assist the said John Doe, with intent that said John Doe should avoid and escape detention, arrest, trial and punishment. (Emphasis added.) Under Massachusetts law, murder is defined as "the killing of a human being, with malice aforethought." Mass. Gen. L. ch. 277, 39 (1990).4 As the IJ noted, federal courts uniformly have held that voluntary murder is a CIMT, see, e.g., ___ ____ Fong Haw Tan v. Phelan, 162 F.2d 663, 664 (9th Cir. 1947), rev'd ____________ ______ _____ on other grounds, 333 U.S. 6 (1948); see also, e.g., In re _________________ ___ ____ ____ _____ Johnson, 822 P.2d 1317 (Cal. 1992); Burleigh v. State Bar of _______ ________ _____________ Nevada, 643 P.2d 1201, 1204 (Nev. 1982); State v. Lee, 404 S.W.2d ______ _____ ___ 740, 748 (Mo. 1966); In re Noble, 423 P.2d 984, 984 (N.M. 1967) ___________ (second degree murder a CIMT). Furthermore, the IJ reasoned, "[i]f the underlying conduct (assault with intent to murder and murder) is found to be turpitudinous, then the secondary offense (accessory) is also one involving moral turpitude. Matter of __________ Sanchez-Marin, 11 I. & N. Dec. 264 (BIA 1965)." Aquiles Leonidas _____________ ________________ Cabral, Op. Immigr. Judge No. A 38 496 722, at 5-6 (Nov. 18, ______ ____________________ 4The Cabral indictment alleges that Cabral "well [knew] the said John Doe to have" *** "assault[ed] and beat[en] [the vic- tim], with intent to murder him and by such assault and beating did kill and murder the [victim]." Massachusetts law provides that "[t]he following words, when used in an indictment, shall be sufficient to convey the meaning herein attached to them.*** Murder.--The killing of a human being, with malice aforethought." ______ Mass. Gen. L. ch. 277, 39. The relevant distinction, for purposes of the CIMT classification, is between voluntary and involuntary killing, rather than murder and manslaughter. See De ___ __ Lucia, 297 F.2d at 61 ("so long as homicide is voluntary . . . no _____ amount of justification can remove it from the class of [- CIMTs]"). Thus, Cabral pled guilty as an accessory after the fact to voluntary murder, a CIMT. 7 1988). In re Sanchez-Marin, 11 I. & N. Dec. 264, involved ____________________ issues and circumstances similar to those presented here. Three resident aliens were convicted under Massachusetts law; two of manslaughter, see Mass. Gen. L. ch. 265, 13 (1990), and the ___ third as an accessory after the fact, see Mass. Gen. L. ch. 274, ___ 4 (1990), the same "accessory" statute under which Cabral pled guilty. The BIA found it "reasonable to conclude upon the record of conviction that the homicide committed by the aliens was voluntary and consequently this crime involves moral turpitude," In re Sanchez-Marin, 11 I. & N. Dec. at 266, and, as to the third ___________________ alien, that the "indictment links him to the manslaughter commit- __________ _____ ___ __ ___ ____________ _______ ted by the other two aliens," id. at 266-67 (emphasis added). ___ __ ___ _____ ___ ______ ___ Later, the BIA emphasized the significance of the "indictment linkage," between the underlying crime and the acces- sory charge in In re Short, 1989 BIA LEXIS 30 (BIA Nov. 16, ____________ 1989), where an alien was charged as an accessory to the crime of assault with intent to commit an unspecified felony under 18 ___________ U.S.C. 113(b). The IJ determined, from the indictment against ____ ___ __________ _______ the principal, that the principal's crime was a CIMT. Thereaf- ___ _________ ___________ ter, the IJ's ruling that the accessory had been convicted of a _________ CIMT was reversed by the BIA. Id. at *11-*12. The BIA distin- ___ guished Sanchez-Marin: in "that case, the [BIA] was able to look _____________ to the principals' conviction records, as we specifically found that the respondent's (alien's) indictment linked him to the ____________ _______ __________ crime committed by the two principals. [However], no linkage has 8 been established in this case." Id. at *12 (emphasis added). ___ Cabral challenges the Sanchez-Marin rationale itself, _____________ noting that accessories before the fact under Massachusetts law ______ are subject to the same punishment as the principal, whereas the legislature has prescribed different punishments for the separate crime of accessory after the fact.5 Therefore, he says, whether _____ an alien convicted as an accessory after the fact has committed a CIMT must be determined without regard to the turpitude associat- ed with the primary offense committed by the principal. Thus, he argues, Sanchez-Marin is wrongly decided and the INS may not _____________ ascribe to an alien the moral turpitude of the principal's crime since an accessory after the fact need have committed no "'act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right. . . ,'" Marciano v. INS, 450 F.2d 1022, 1025 (8th Cir.), cert. denied, ________ ___ ____ ______ 405 U.S. 997 (1971) (quoting Ng Sui Wing v. United States, 46 ____________ ______________ F.2d 755, 756 (7th Cir. 1931)). Although Cabral correctly asserts that Sanchez-Marin is "presumptive . . . and bereft of _____________ any reasoning or analysis" supporting its conclusion, we do not agree that the BIA's interpretation of section 1251(a)(4) can be ruled unreasonable, arbitrary, or contrary to law. ____________________ 5Of course, the definition of a CIMT under 1251(a)(4) is a matter of federal law. See Babouris v. Esperdy, 269 F.2d 621, ___ ________ _______ 623 (2d Cir. 1959), cert. denied, 362 U.S. 913 (1960); Burr v. ____ ______ ____ INS, 350 F.2d 87, 90 (9th Cir. 1965), cert. denied, 383 U.S. 915 ___ ____ ______ (1966). We look to state law only to determine the elements of the offense of conviction. See In re H, 7 I. & N. Dec. 359, 360 ___ _______ (BIA 1956). 9 For present purposes, we accept arguendo the premise ________ that the CIMT determination may take into account only the moral turpitude involved in the criminal conduct to which Cabral pled guilty as determined from the record of conviction,6 including the indictment, see Zaffarano, 63 F.2d at 759. Even so, the BIA ___ _________ found moral turpitude based on the indictment to which Cabral pled guilty, not the indictment against John Doe. See supra at ___ _____ p. 6; see also Sanchez-Marin, 11 I. & N. Dec. at 266-67. Given ___ ____ _____________ Cabral's guilty plea to an indictment alleging that he knew that ____ the principal intentionally murdered another human being and that _____________ Cabral intentionally assisted the principal in avoiding deten- _____________ tion, trial and punishment, we discern nothing arbitrary, unreasonable, or contrary to law in the BIA's determination that Cabral himself committed a "crime involving moral turpitude." See Marciano, 450 F.2d at 1025. To state the question in the ___ ________ ____________________ 6We have explained that the principal reason the INS and reviewing courts do not go beyond the record of conviction is administrative workability: If the crime in its general nature is one which in common usage would be classified as a [CIMT], neither the administrative officials in a deportation proceed- ing nor the courts on review of administrative action are under the oppressive burden of taking and consider- ing evidence of the circumstances of a particular offense so as to determine whether there were extenuat- ing factors which might relieve the offender of the stigma of moral obliquity. Pino v. Nicholls, 215 F.2d 237, 245 (1st Cir. 1954), rev'd on ____ ________ ________ other grounds sub nom. Pino v. Landon, 349 U.S. 901 (1955) (per ______________________ ____ ______ curiam). Accord Castie v. INS, 541 F.2d 1064, 1066 n.5 (4th Cir. ______ ______ ___ 1976); see also Chiaramonte v. INS, 626 F.2d 1093, 1098 (2d Cir. ___ ____ ___________ ___ 1980) (unfair to conduct satellite proceeding in forum which may be far removed from original crime scene). 10 context presented is to answer it: Is it unreasonable for the executive agency entrusted by Congress with primary responsibili- ty for the administration of the deportation of resident aliens to find that an alien who knowingly assisted the perpetrator of a brutal murder to avoid detention, trial and punishment, has himself committed a "crime involving moral turpitude"? Although we recognize the force of the countervailing view, we are not persuaded that the BIA's interpretation and application of section 1251(a)(4) can be considered either arbitrary, unrea- sonable or contrary to law.7 We therefore conclude that the petition for review must be denied, as the BIA's interpretation of 8 U.S.C. 1251(a)(4) is not unreasonable, arbitrary, capricious, or manifestly con- trary to the statute, and its application in the present case was not impermissible. So Ordered. So Ordered. __ _______ ____________________ 7Cabral incorrectly contends that Sanchez-Marin does not _____________ apply here because the principal has never been convicted, whereas in Sanchez-Marin the principals pled guilty. First, _____________ under Massachusetts law, the principal need not have been con- victed in order to convict an accessory after the fact. See ___ Mass. Gen. L. ch. 274, 5 (1990). Second, Cabral's guilty plea collaterally estops him from denying the essential allegations of the indictment, including not only his intentional assistance to the principal but his knowledge that the principal committed voluntary murder. See Manzoli v. Commissioner, 904 F.2d 101, 105 ___ _______ ____________ (1st Cir. 1990) (party to civil action collaterally estopped from relitigating material issue resolved against him in prior crimi- nal action). As the IJ observed, proof that the underlying murder was committed would have been essential had Cabral gone to trial. See Commonwealth v. Eagan, 259 N.E. 548, 551 (Mass. ___ ____________ _____ 1970). 11